[No. D046360. Fourth Dist., Div. One. May 8, 2006.]

BANKER'S HILL, HILLCREST, PARK WEST COMMUNITY
PRESERVATION GROUP, Plaintiff and Appellant, v.
CITY OF SAN DIEGO, Defendant and Respondent;
MI ARBOLITO, LLC, et al., Real Parties in Interest and Respondents.

**COUNSEL**

Johnson & Hanson, Kevin K. Johnson and Jared Phil Hanson for Plaintiff and Appellant.

Michael J. Aguirre, City Attorney, and Joe B. Cordileone, Deputy City Attorney, for Defendant and Respondent.

Seltzer Caplan McMahon Vitek, Monty A. McIntyre and G. Scott Williams for Real Parties in Interest and Respondents.

**OPINION**

**IRION, J.**—In this appeal we are asked to decide whether respondent City of San Diego (the City) properly determined that the proposed development of a 14-story residential building is exempt from the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] under a categorical exemption for urban in-fill development projects set forth in the Guidelines for Implementation of CEQA (Guidelines) adopted by the Secretary of the California Resources Agency (the Secretary).[2] (Guidelines, § 15332.)

For the reasons set forth below, we affirm the judgment.

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

[2] The Guidelines adopted by the Secretary appear at California Code of Regulations, title 14, section 15000 et seq. "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

For convenience, we will refer to both CEQA and Guidelines sections and subdivisions in a shortened form, i.e., CEQA section 21080(b)(1) and Guidelines section 15002(k).

 

I

## FACTUAL AND PROCEDURAL BACKGROUND

Real parties in interest and respondents, developers Mi Arbolito, LLC, and 1700 Investors, LLC, and architect Martinez + Cutri Corporation (collectively, the Developer) propose to construct a 14-unit, 14-story multifamily residential building at 3415 Sixth Avenue in San Diego, with underground parking (the Project). The site of the Project is a 10,247-square-foot vacant lot located on the northeast corner of Sixth Avenue and Upas Street, which is zoned for multiresidential use. Across the street from the Project is the north west corner of Balboa Park—an approximately 1,100-acre developed urban park containing theaters, museums, restaurants and other public facilities. Approximately one block away from the Project, on Seventh Avenue, is the historic Marston House, a designated historical landmark, with other historic residences nearby. Directly to the east of the lot, on Upas Street, is a high-rise condominium building referred to as Del Prado, which is approximately the same height as the building proposed for the Project, but three and a half times as wide.

The Developer first proposed the Project to the City in March 2003.[3] In November 2003, the City approved a shoring and grading permit, authorizing the Developer to begin site preparation work, including excavation for the parking garage. Approximately two months later, in January 2004, the City issued a building permit for pad footings for the building's underground parking garage.

Appellant Banker's Hill, Hillcrest, Park West Community Preservation Group (the Preservation Group) filed a petition for a writ of mandate, alleging that the City had violated CEQA by approving the Project without conducting an environmental review under CEQA.[4] In March 2004, the trial court denied the Preservation Group's application for preliminary injunctive relief on the basis, among others, that the City was in the process of considering what kind of environmental review to undertake for the Project.

After preliminary discussions between the Developer and the City staff regarding CEQA's application to the Project, the Developer submitted a formal request to the City on March 26, 2004, for a determination of

---

[3] The Developer twice submitted and withdrew tentative maps indicating that the Project would be marketed as a condominium project. It is uncertain from the record, and the parties dispute, whether the Project will be an apartment project or a condominium project.

[4] The original petition was filed on January 6, 2004. A first amended petition was filed on February 13, 2004.

exemption from CEQA. On March 29, 2004, the City's Development Services Department issued a notice of exemption pursuant to CEQA section 21152(b). The notice of exemption stated that the Project is exempt from CEQA for two separate reasons. First, the Project requires only ministerial approval by the City, and thus is exempt under CEQA section 21080(b)(1) and Guidelines section 15268, which exempt ministerial approvals from CEQA.[5] Second, the Project is an urban in-fill development project, and thus is exempt from CEQA under Guidelines section 15332.

The Preservation Group appealed the notice of exemption to the City Council. (See CEQA, § 21151(c).)[6] Based on further investigation, the City Manager submitted a report to the City Council, which recommended that the City Council deny the appeal. Because of evidence that the Project may end up being constructed as a condominium project, the City Manager did not recommend that the City Council find the Project to be exempt on the ground that it would require only ministerial approvals. Instead, the City Manager recommended that the City Council rely solely on the exemption for urban in-fill development under Guidelines section 15332.

Following a public hearing, the City Council denied the appeal and enacted a resolution stating that "the Project meets the conditions described in State Guidelines section 15332 and therefore qualifies for a categorical exemption and . . . no exceptions as described in [Guidelines] section 15300.2 apply to the Project." The resolution makes specific findings regarding zoning, traffic, noise, air quality, and water quality, among other things. It states that "[a]pproval of the Project would not result in any significant effects relating to traffic, noise, air quality, or water quality," and that "[t]here is no reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." Based on the resolution, the City filed a notice of exemption on October 8, 2004, citing the exemption for urban in-fill development in Guidelines section 15332.

[5] At the time that the City's Development Services Department made this determination, there was no tentative subdivision map pending before it that would have indicated that the Project was intended to be a condominium project. As the parties explain, the construction of a condominium project would require discretionary approval by the City, while the construction of an apartment building would normally only require ministerial approvals. (See CEQA, § 21080(a) [including approval of a tentative subdivision map as a discretionary project]; Gov. Code, § 66424 [defining " '[s]ubdivision' " to include condominium projects].) The City's Development Services Department apparently concluded the Project required only ministerial approvals under the assumption that it would be an apartment building rather than a condominium.

[6] CEQA section 21151(c) states: "If a nonelected decisionmaking body of a local lead agency certifies an environmental impact report, approves a negative declaration or mitigated negative declaration, or determines that a project is not subject to this division, that certification, approval, or determination may be appealed to the agency's elected decisionmaking body, if any."

Following the City Council's determination, the Preservation Group filed a second amended petition for writ of mandate on November 14, 2004. The trial court denied the petition, agreeing with the City that the Project is exempt from CEQA under Guidelines section 15332. On the basis, among others, that the issue had not been raised during the administrative proceedings, the trial court also rejected the Preservation Group's contention that the City impermissibly reviewed the Project in a piecemeal manner by approving the grading, shoring and pad footings permits before conducting a preliminary review of whether to approve the entire Project.

The Preservation Group appeals, contending that the City incorrectly determined the Project was exempt from CEQA and that the City impermissibly reviewed the Project in a piecemeal manner.

II

DISCUSSION

In considering a petition for a writ of mandate in a CEQA case, "[o]ur task on appeal is 'the same as the trial court's.' [Citation.] Thus, we conduct our review independent of the trial court's findings." (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602, fn. 3 [35 Cal.Rptr.2d 470] (*Quail Botanical Gardens*).) Accordingly, we examine the City's decision, not the trial court's.

An important threshold question in this case is the standard by which we review the City's decision. To better define our inquiry, we first turn to an overview of the CEQA process.

A

*Overview of the CEQA Process*

CEQA establishes "a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." We explain these three steps in detail below. (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 [62 Cal.Rptr.2d 612] (*Davidon*); see also Guidelines, § 15002(k) [describing three-step process].)

1. *First Step in the CEQA Process*

The first step "is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed

activity." (*Davidon, supra*, 54 Cal.App.4th at p. 112; see also Guidelines, § 15060.) The Guidelines give the agency 30 days to conduct this preliminary review. (Guidelines, § 15060.) As part of the preliminary review, the public agency must determine the application of any statutory exemptions or categorical exemptions that would exempt the proposed project from further review under CEQA. (See Guidelines, § 15282 [listing statutory exemptions]; Guidelines, §§ 15300–15333 [listing 33 classes of categorical exemptions].)[7] The categorical exemptions are contained in the Guidelines and are formulated by the Secretary under authority conferred by CEQA section 21084(a).[8] If, as a result of preliminary review, "the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary. The agency may prepare and file a notice of exemption, citing the relevant section of the Guidelines and including a brief 'statement of reasons to support the finding.' " (*Davidon, supra*, 54 Cal.App.4th at p. 113, citing Guidelines, §§ 15061(d), 15062(a)(3).)

### 2. *Second Step in the CEQA Process*

■ If the project does not fall within an exemption, the agency proceeds to the second step of the process and conducts an initial study to determine if the project *may* have a significant effect on the environment. (Guidelines, § 15063.) If, based on the initial study, the public agency determines that "there is substantial evidence, in light of the whole record . . . that the project may have a significant effect on the environment, an environmental impact report [(EIR)] shall be prepared." (CEQA, § 21080(d).) On the other hand, if the initial study demonstrates that the project "would not have a significant effect on the environment," either because "[t]here is no substantial evidence, in light of whole record" to that effect or the revisions to the project would avoid such an effect, the agency makes a "negative declaration," briefly describing the basis for its conclusion. (CEQA, § 21080(c)(1); see Guidelines, § 15063(b)(2); *Davidon, supra*, 54 Cal.App.4th at p. 113.)

The Guidelines and case law further define the standard that an agency uses to determine whether to issue a negative declaration. "[I]f a lead agency is presented with a *fair argument* that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not

---

[7] Relevant to the City's Development Services Department's decision that the Project was exempt because it required only ministerial approvals, "the Legislature has determined that ministerial projects are exempt from CEQA review" as a statutory exemption. (*Davidon, supra*, 54 Cal.App.4th at p. 112, citing CEQA, § 21080(b)(1) & (2); Guidelines, §§ 15061(b)(2), 15260.)

[8] CEQA section 21084(a) states that the Guidelines should include "a list of classes of projects which have been determined not to have a significant effect on the environment and which shall be exempt from this division."

have a significant effect." (Guidelines, § 15064(f)(1), italics added.) This formulation of the standard for determining whether to issue a negative declaration is often referred to as the "fair argument" standard. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1134–1135 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).)

### 3. *Third Step in the CEQA Process*

■ If no negative declaration is issued, the preparation of an EIR is the third and final step in the CEQA process. (*Davidon, supra,* 54 Cal.App.4th at p. 113; Guidelines, §§ 15063(b)(1), 15080; CEQA, §§ 21100, 21151.)

### B

### *The Issue Presented Here Concerns the First Step in the CEQA Process*

At issue in this case is only the *first* step in the CEQA process: whether the Project is exempt from further CEQA review because it falls under a categorical exemption. Here, the City concluded that the Project was exempt because it satisfied each of the elements of the categorical exception for urban in-fill development set forth in Guidelines section 15332. (See *Communities for a Better Enviroment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 126–130 [126 Cal.Rptr.2d 441] [upholding the validity of Guidelines, § 15332].) Guidelines section 15332 states that urban in-fill development is exempt from CEQA if it meets the following conditions (the urban in-fill exemption):

"(a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations.

"(b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.

"(c) The project site has no value as habitat for endangered, rare or threatened species.

"(d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.

"(e) The site can be adequately served by all required utilities and public services."

The first issue in this appeal is whether the urban in-fill exemption fails to apply by its own terms, either because (1) the Project is inconsistent with the applicable general plan; (2) the Project is not "substantially surrounded by urban uses"; or (3) approval of the Project would result in significant effects relating to traffic.[9]

An exemption may also be inapplicable because of a blanket *exception* to the categorical exemptions, as set forth in Guidelines section 15300.2. According to this exception, "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2(c).) As the second main issue in this appeal, the Preservation Group contends there is a reasonable possibility that the Project will create a significant effect on the environment due to unusual circumstances, and thus the urban in-fill exemption does not apply.

Based on the above, the two main issues in this appeal are (1) whether the urban in-fill exemption applies according to its own terms; and (2) whether the *exception* to the exemption set forth in Guidelines section 15300.2(c) applies because there is a reasonable possibility of a significant effect on the environment due to unusual circumstances. Keeping in mind the two main issues in this appeal, we next examine the standards that apply to our review of the City's decision.

### C

*Applicable Legal Standards*

CEQA establishes the basic standard of review in a mandamus proceeding. "The standard of review in an action to set aside an agency determination under CEQA is governed by [CEQA] section 21168 in administrative mandamus proceedings, and [CEQA] section 21168.5 in traditional mandamus actions. The distinction between these two provisions 'is rarely significant. In either case, the issue before the . . . court is whether the agency abused its discretion. Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by

---

[9] The Preservation Group does not challenge the City's findings with respect to the elements of the urban in-fill exemption that "[t]he project site has no value . . . as habitat for endangered, rare or threatened species" and "[t]he site can be adequately served by all required utilities and public services." (Guidelines, § 15332(c) & (e).) It also does not challenge the City's finding on the portion of the "significant effects" element of the urban in-fill exemption relating to "noise, air quality, or water quality." (Guidelines, § 15332(d).) Because the Preservation Group does not raise challenges on those issues, we do not address them.

substantial evidence.' " (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945 [91 Cal.Rptr.2d 66] (*County of Amador*).)[10]

### 1. *The Standard Governing the City's Determination That No Exception to the Urban In-fill Exemption Applied*

We first address the standard that applies to the City's determination that the *exception* set forth in Guidelines section 15300.2(c) was inapplicable, i.e., that there was no reasonable possibility of a significant effect to the environment due to unusual circumstances.

■ The Preservation Group had the burden on that issue at the administrative level. "In categorical exemption cases, where the agency establishes that the project is within an exempt class, the burden shifts to the party challenging the exemption to show that the project is not exempt because it falls within one of the exceptions listed in Guidelines section 15300.2." (*Davidon, supra,* 54 Cal.App.4th at p. 115.) The challenger has the burden "to ' "produce substantial evidence that the project has the potential for a substantial adverse environmental impact" ' [citations]; in other words, that one of the exceptions to categorical exemption applies." (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 796 [124 Cal.Rptr.2d 731] (*Santa Monica Chamber*).)

### a. *Divergence in the Case Law Between the Fair Argument Standard and the Traditional Substantial Evidence Standard*

The authorities have purported to describe a "split" in the case law on the issue of how a court should review an agency's decision that there is no *reasonable possibility of a significant effect on the environment* under Guidelines section 15300.2(c).[11] (*Fairbank v. City of Mill Valley* (1999) 75

---

[10] Case law defines "substantial evidence" supporting an agency's decision as " 'relevant evidence that a reasonable mind might accept as adequate support for a conclusion' " (*Bhatt v. Depart. of Health Services* (2005) 133 Cal.App.4th 923, 928 [35 Cal.Rptr.3d 335] (*Bhatt*)) or "evidence of ' "ponderable legal significance . . . reasonable in nature, credible, and of solid value" ' " (*Ofsevit v. Trustees of Cal. State University & Colleges* (1978) 21 Cal.3d 763, 773, fn. 9 [148 Cal.Rptr. 1, 582 P.2d 88]). CEQA section 21080(e)(1) states: "For the purposes of this section and this division, substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."

[11] The dispute in the case law focuses on how a court should review an agency's finding that there is no "reasonable possibility" of a "significant effect." It does not concern how a court should review whether "unusual circumstances" exist. On that issue, case law establishes that any factual determination relating to the existence of a certain circumstance is reviewed as a question of fact under the substantial evidence standard, but "the question whether that circumstance is 'unusual' within the meaning of the significant effect exception would normally be an issue of law that this court would review de novo." (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1207 [61 Cal.Rptr.2d

Cal.App.4th 1243, 1259–1260 [89 Cal.Rptr.2d 233] (*Fairbank*); *Santa Monica Chamber, supra,* 101 Cal.App.4th at pp. 795–797.) One approach would apply a fair argument standard to the question of whether substantial evidence supports the City's decision, similar to the standard applied in reviewing an agency's decision to issue a negative declaration. (See, e.g., Guidelines, § 15064(f)(1) [setting forth the fair argument standard in a negative declaration context].) Under that standard, the court would review the record to determine whether it contained evidence of a fair argument that the project *may* have a significant effect on the environment. The other approach would apply what is referred to as the "traditional" substantial evidence review. (See, e.g., *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720 [3 Cal.Rptr.2d 488] (*Ukiah*).) Under that approach, a court will uphold an agency's decision if there is *any* substantial evidence in the record that there will be *no* significant effect on the environment.[12]

---

447] (*Azusa*).) Throughout our discussion we will sometimes refer to whether there is a reasonable possibility of a "significant effect," without stating "due to unusual circumstances." Our use of this shorthand terminology is in no way intended to negate the "due to unusual circumstances" portion of the exception.

[12] Among the cases that might be interpreted as supporting the application of a traditional approach are: *Ukiah, supra,* 2 Cal.App.4th 720, 728–729, fn. 7 (which observed that the traditional substantial evidence standard may be more appropriate than the fair argument standard); *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1601 [275 Cal.Rptr. 901] and *Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, 842, 844 [171 Cal.Rptr. 753] (both of which state that courts should *not* independently reweigh the evidence in reviewing an agency's findings made under Guidelines section 15300.2(c)); and *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 824–825 [17 Cal.Rptr.2d 766] (which cites *Dehne* and *Ukiah*). Among the cases that might be interpreted as supporting the application of the fair argument approach are *Azusa, supra,* 52 Cal.App.4th 1165, and *Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644 [11 Cal.Rptr.2d 850] *Azusa* appears to have applied a fair argument standard when it concluded that there was a "fair argument as a matter of law that there was a reasonable possibility" that the activity at issue in that case would have a significant effect on the environment. (*Azusa,* at p. 1198.) Similarly, *Dunn-Edwards* cited case law applying the fair argument standard in the context of a negative declaration and stated that in reviewing an agency's rejection of the exception set forth in Guidelines section 15300.2(c), "if the court perceives there was substantial evidence that the project might have an adverse impact, . . . the agency's action must be set aside." (*Dunn-Edwards,* at p. 656.)

Describing this disparate case law, *Fairbank* explained: "There is a split of authority on the appropriate standard of judicial review for a local agency's decision on the applicability of the Guidelines section 15300.2(c) exception to a project that has been found to fall within a categorical exemption. Some courts have relied on cases involving review of a negative declaration, holding that a finding of categorical exemption cannot be sustained if there is a 'fair argument' based on substantial evidence that the project will have significant environmental impacts, even where the agency is presented with substantial evidence to the contrary. [Citation.] Other courts apply an ordinary substantial evidence test to questions of fact relating to the significant effect exception, deferring to the express or implied findings of the local agency that has found a categorical exemption applicable." (*Fairbank, supra,* 75 Cal.App.4th at pp. 1259–1260.)

As we will explain, the type of analysis conducted by a reviewing court will depend on the type of inquiry the agency has conducted, i.e., whether the agency itself has applied a fair argument or a traditional approach. Under one type of inquiry by an agency, the agency will *weigh evidence* and *make a finding* as to whether there will be a significant effect. This is the traditional approach. Under another type of inquiry by an agency, it will simply inquire whether, as a matter of law, the record contains credible evidence *to support an argument* that there may be a significant effect, but the agency would not *weigh the evidence* or *resolve any conflict*. This is the fair argument approach.

To better illustrate the two approaches, we provide the following example. Suppose that an agency is faced with two credible expert reports reaching different conclusions about whether a project will create a significant effect on the environment. The first approach (the traditional approach) would have the agency *decide between* the credible expert reports and *make a finding*, after weighing the reports, as to whether a project will cause a significant effect. The second approach (the fair argument approach) would have the agency take note of the fact that credible expert reports disagree, and without weighing the reports or making any further findings, conclude that there is necessarily a *reasonable possibility* of a significant effect, since at least one credible expert report reached that conclusion.

■ In the context of an agency's decision not to issue a negative declaration, our Supreme Court and the Guidelines have directed that agencies follow the fair argument approach: an agency is merely supposed to look to see if the record shows substantial evidence of *a fair argument* that there may be a significant effect. (Guidelines, § 15064(f)(1) ["if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect"]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66] (*No Oil*) [adopting fair argument standard].) In other words, the agency is not to weigh the evidence to come to its own conclusion about whether there will be a significant effect. It is merely supposed to inquire, *as a matter of law*, whether the record reveals a fair argument. As one court has explained, " '[t]he lead agency's determination is . . . largely legal rather than factual; it *does not resolve conflicts in the evidence* but determines only whether substantial evidence exists in the record to support the prescribed fair argument.' " (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1400 [43 Cal.Rptr.2d 170] (*Gentry*), italics added.)

The application of the fair argument approach by an agency necessarily impacts a reviewing court's analysis. Because the fair argument approach ultimately presents a question of law about the presence of certain evidence in the record, not a question about whether evidence supports an agency's *factual finding*, "[i]n effect . . . the determination before the court raise[s] only *a question of law*, namely, the sufficiency of the evidence to support a fair argument. Such a question, under that decision, may be independently analyzed by the courts regardless of the scope of judicial review." (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073 [230 Cal.Rptr. 413], italics added.) "[T]he reviewing court's 'function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed "fair argument" could be made.' " (*Quail Botanical Gardens, supra*, 29 Cal.App.4th at p. 1602, fn. omitted, italics added.) Thus, the reviewing court effectively conducts an independent review, also applying the fair argument standard, to determine whether the record contains evidence of a fair argument that a proposed project will have a significant effect on the environment.

In contrast, when a reviewing court examines an agency's finding under the traditional approach, the reviewing court is presented with an uncomplicated question of whether the agency's factual finding is supported by substantial evidence. (See CEQA, §§ 21168, 21168.5; *County of Amador, supra,* 76 Cal.App.4th at p. 945.) Because the agency has made a factual finding of whether a proposed project will have a significant effect on the environment rather than a determination as a matter of law of whether the record contains evidence supporting a fair argument of such effects, the reviewing court need not conduct the independent review required by the fair argument approach. Instead, the court will affirm the agency's finding if the record contains " 'relevant evidence that a reasonable mind might accept as adequate support for a conclusion' " (*Bhatt, supra,* 133 Cal.App.4th at p. 928), on the issue of whether a proposed project will create a significant effect on the environment.

As we will explain, we conclude that an agency must apply a fair argument approach in determining whether, under Guidelines section 15300.2(c), there is no reasonable possibility of a significant effect on the environment due to unusual circumstances. Accordingly, as a reviewing court we independently review the agency's determination under Guidelines section 15300.2(c) to determine whether the record contains evidence of a fair argument of a significant effect on the environment.

b. *The Fair Argument Standard Applies*

Our conclusion that the fair argument standard applies to an agency's determination under Guidelines section 15300.2(c) is based on two considerations: (1) the close textual similarities between Guidelines section 15300.2(c)

and CEQA section 21151, from which the fair argument standard was originally derived; and (2) the applicability of the policy reasons behind the original adoption of the fair argument standard.

First, we explain the close textual similarities. "[T]he 'fair argument' test was derived from an interpretation of the language of, and policies underlying, [CEQA] section 21151 itself." (*Laurel Heights II, supra,* 6 Cal.4th at p. 1135.) That provision states that an EIR is required "on any project . . . which *may* have a significant effect on the environment." (CEQA, § 21151(a), italics added.) Based on this language, and on the policy of interpreting CEQA " 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language,' " our Supreme Court decided that CEQA requires preparation of an EIR "whenever it can be fairly argued on the basis of substantial evidence that the project *may* have significant environmental impact." (*No Oil, supra,* 13 Cal.3d at pp. 75, 83, italics added.)

Similar to the focus in CEQA section 21151(a) on whether a project "*may* have a significant effect on the environment" (italics added), the application of Guidelines section 15300.2(c) turns on whether there is "*a reasonable possibility* that the activity will have a significant effect on the environment" (*ibid.,* italics added). Our Supreme Court has explained that "the word 'may' connotes a 'reasonable possibility.' " (*No Oil, supra,* 13 Cal.3d at p. 83, fn. 16.) Thus, the phrases "*may* have a significant effect" and "*a reasonable possibility*" of a significant effect are substantively identical. Because the fair argument standard was derived from a phrase in CEQA section 21151(a), which is substantively identical to the phrase in Guidelines section 15300.2(c), it is logical to apply the fair argument standard to both of them. Both provisions reasonably can be read, as *No Oil* read CEQA section 21151, as calling on the agency to determine whether the record reflects a *reasonable possibility* of a significant effect rather than to make findings and weigh evidence to determine if there *will be* a significant effect. Indeed, precedent favors applying a fair argument standard when the inquiry at issue is substantially similar to the inquiry made in CEQA section 21151. (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1317 [8 Cal.Rptr.2d 473] [concluding that the fair argument standard applied to an agency's decision whether to prepare a tiered EIR for a later project because the relevant provision required the agency to determine whether the later project *may* cause significant effects on the environment, which was similar to the provision in CEQA section 21151 that gave rise to the fair argument standard].)[13]

---

[13] Our Supreme Court has observed that the " 'fair argument' test has been applied *only* to the decision whether to prepare an original EIR or a negative declaration," and has rejected the application of the fair argument standard to an agency's decision of whether it is required to

Next, we analyze whether the policy behind the adoption of the fair argument standard for CEQA section 21151 is applicable here as well. As our Supreme Court has stated in adopting the fair argument standard, CEQA should be interpreted to " 'afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*No Oil, supra*, 13 Cal.3d at p. 84.) Application of the fair argument standard to Guidelines section 15300.2(c) is consistent with that policy, as the language of the provision reasonably can be interpreted to call for the agency to determine whether there is a fair argument for a significant effect. Applying that standard would afford more protection to the environment than an interpretation that allowed us to uphold an agency's determination whenever the record contained *any* substantial evidence supporting a finding that a project *would not* have a significant effect on the environment.

We further conclude that it is consistent with the policy behind CEQA to preclude an agency from relying on a categorical exemption when there is a fair argument that a project will have a significant effect on the environment, because, as our Supreme Court has noted, the Secretary "is empowered to exempt *only* those activities which do not have a significant effect on the environment. [Citation.] It follows that where there is *any reasonable possibility* that a project or activity may have a significant effect on the environment, an exemption would be improper." (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 205–206 [132 Cal.Rptr. 377, 553 P.2d 537] (*Chickering*), italics added.)[14] This important limitation on the Secretary's authority, as established by CEQA, is best upheld by disallowing an exemption for any

---

recirculate an EIR when " 'significant new information' " has been added. (*Laurel Heights II, supra*, 6 Cal.4th at pp. 1135, 1136.) We do not believe our Supreme Court's rejection of the fair argument standard in *Laurel Heights II* precludes the decision we reach here—that the fair argument standard applies to an agency's decision whether there is a reasonable possibility of a significant effect on the environment under Guidelines section 15300.2(c). As the Supreme Court pointed out in *Laurel Heights II*, the genesis of the fair argument standard in *No Oil, supra*, 13 Cal.3d 68, 75, 83–85, was "[CEQA] section 21151[, which] commands that an EIR must be prepared whenever a project '*may* have a significant effect on the environment.' " (*Laurel Heights II*, at p. 1134.) The recirculation of an EIR, on the other hand, is required only if the agency finds " 'significant new information.' " (*Ibid.*) Because the decision whether to recirculate an EIR is *not* based on an inquiry into whether a project *may* have a significant effect on the environment, the inquiry at issue in *Laurel Heights II* is not analogous to the inquiry here: whether there is *a reasonable possibility* of a significant effect on the environment.

[14] "To implement the rule laid out in *Chickering*, Guidelines section 15300.2, subdivision (c) was adopted" (*Fairbank, supra*, 75 Cal.App.4th at pp. 1251–1252), excepting from the operation of the categorical exemptions, any project that posed a reasonable possibility of a significant effect on the environment due to unusual circumstances.

project where the record reflects a fair argument that there may be a significant effect on the environment due to unusual circumstances.[15]

Thus, we conclude that the City was required to apply the fair argument approach with respect to the issue raised by Guidelines section 15300.2(c), and accordingly, we will independently review the record using that standard. If, in independently reviewing the record, we perceive evidence of a fair argument that there may be a significant effect on the environment due to unusual circumstances, we will conclude that the City abused its discretion because its decision to the contrary is not supported by substantial evidence.

### 2. The Standard Governing the City's Determination That the Urban In-fill Exemption Applied by Its Own Terms

Next we examine how the standard of review should be applied to the question of whether the urban in-fill exemption applies, by its own terms, to the Project. Except for one issue, which we discuss below, the application of the substantial evidence standard of review as set forth in CEQA sections 21168 and 21168.5 in this context is relatively straightforward. The authorities are in agreement that "the substantial evidence test governs our review of the city's factual determination that a project falls within a categorical exemption." (*Fairbank*, *supra*, 75 Cal.App.4th at p. 1251; see also *Davidon*, *supra*, 54 Cal.App.4th at p. 115 ["On review, an agency's categorical exemption determination will be affirmed if supported by substantial evidence that the project fell within the exempt category of projects"]; *Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 475 [129 Cal.Rptr.2d 344] (*Magan*) [an agency "only has the burden to demonstrate substantial evidence that the ordinance fell within the exempt category of projects"]; *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1148 [249 Cal.Rptr. 439] ["Our concern is whether there is substantial evidence supporting the [agency's] assertion of exemption"].) Although " 'there is no statutory requirement of a preliminary study attending an agency decision to use [an] exemption[,] . . . [¶] . . . the administrati[ve] record must disclose substantial evidence of every element of the contended exemption.' " (*CalBeach Advocates v. City of Solana Beach* (2002) 103 Cal.App.4th 529, 536 [127 Cal.Rptr.2d 1] (*CalBeach Advocates*) [addressing statutory exemptions].) This standard is easily applied to two of the three issues presented by the City's determination that the urban in-fill

---

[15] The Developer contended at oral argument that because the categorical exemptions have been expressly determined by the Secretary "to not have environmental impacts" and "the analysis has already been done," we should not apply "a low threshold rule" such as the fair argument standard "when we are dealing with categorical exemptions." We do not agree. Because the Secretary is only authorized to formulate exemptions that do not have a significant effect on the environment (*Chickering*, *supra*, 18 Cal.3d at pp. 205–206), no statutory policy exists in favor of applying categorical exemptions where a fair argument can be made that a project will create a significant effect on the environment.

exemption applies, namely, the City's determination that the Project (1) is consistent with the applicable general plan, and (2) is substantially surrounded by urban uses. With respect to these determinations, we simply review the record to determine whether substantial evidence supports the City's findings as to these elements.[16]

However, as the Preservation Group points out, the urban in-fill exemption contains one unique element that arguably complicates the application of the standard of review. The urban in-fill exemption states that it applies only if "[a]pproval of the project *would not result in any significant effects* relating to traffic, noise, air quality, or water quality." (Guidelines, § 15332(d), italics added.) Because this provision requires the City's finding *as to significant effects*, it is in some respects similar to Guidelines section 15300.2(c), discussed above, which requires a determination that there is no "reasonable possibility that the activity will have a *significant effect* on the environment due to unusual circumstances." (Italics added.) The Preservation Group advocates that we approach the "significant effect" aspect of the urban in-fill exemption in the same way that we approach the exception set forth in Guidelines section 15300.2(c), namely, by asking if the record shows substantial evidence of a *fair argument* that there could be a significant effect on the environment. As we explain, because of the differences between Guidelines section 15300.2(c) and the significant effect element of the urban in-fill exemption, we reject the Preservation Group's argument that the same standard of review should apply to both.

Although there are several important differences between the language of Guidelines section 15300.2(c) and the significant effect element of the urban in-fill exemption,[17] the dispositive difference for the purpose of our analysis is that the urban in-fill exemption does not refer to a *reasonable possibility* of a significant effect. Instead, the urban in-fill exemption requires the agency to determine that "[a]pproval of the project *would not result*" in a significant effect to traffic, noise, air quality, or water quality.[18] (Guidelines, § 15332(d), italics added.) Thus, the urban in-fill exemption calls for the agency to make

---

[16] Of course, as to either of these elements, if we perceive a need to interpret the terms used in the exemption, we independently interpret the exemption using a de novo standard of review in our interpretation. (*Fairbank, supra*, 75 Cal.App.4th at p. 1251.)

[17] For one thing, the "significant effect" language in the urban in-fill exemption refers only to certain types of environmental effects, namely, "traffic, noise, air quality, or water quality." (Guidelines, § 15332(d).) In contrast, Guidelines section 15300.2(c) applies to *all* types of significant environmental effects. In addition, unlike Guidelines section 15300.2(c), the significant effect element of the urban in-fill exemption, does not require *unusual circumstances*, but instead, by its terms, applies to a significant effect on traffic, noise, air quality, or water quality caused by *any* circumstance.

[18] Similarly, comparing the language of the urban in-fill exemption to the language of CEQA section 21151(a), which, as we have explained, first gave rise to the fair argument standard, we

a *definitive finding*, at the preliminary review stage, as to whether or not there will be a significant environmental effect. We note that the Secretary could have elected to use the term "may" or "reasonable possibility" in the significant effect element of the urban in-fill exemption, thus invoking the fair argument standard, but did not. Instead, the urban in-fill exemption simply directs the agency to determine if a project *"would not"* have a significant effect. (Guidelines, § 15332(d), italics added.) The use of this language leads us to conclude that the fair argument standard does not apply.

Consistent with this analysis, a leading commentator has suggested that the fair argument standard does not apply to the significant effect element of the urban in-fill exemption because the urban in-fill exemption does not depend on whether a project *may* have a significant effect, but instead depends on if it *will* have a significant effect. "Had the Resources Agency intended that a reviewing court use the more stringent 'fair argument' standard of review, then it would have instead used terms echoing that standard as it appears in other contexts (e.g., 'there is no substantial evidence that approval of the project *may* have significant effects relating to traffic, noise, air quality, or water quality'). This view is consistent with the general rule that the courts, in reviewing an agency's decision to rely on a categorical exemption, employ the 'substantial evidence' standard of review." (Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 117.) We agree with this reasoning.

Having concluded that the fair argument standard does not apply to the City's finding regarding the significant effect element of the urban in-fill exemption, we apply the traditional substantial evidence standard of review. We inquire whether the record contains substantial evidence to support the City's finding that the Project will not have a significant effect. If we locate substantial evidence in the record to support that conclusion, we will uphold the City's determination, even if other evidence arguably supports a different conclusion.[19]

---

see that the fair argument standard originated with a provision requiring an agency to determine whether a project *may* have a significant effect.

[19] We recognize that because " 'the administrati[ve] record must disclose substantial evidence of every element of the contended exemption' " (*CalBeach Advocates, supra,* 103 Cal.App.4th at p. 536), and an agency "has the burden to demonstrate substantial evidence that the ordinance fell within the [exemption]" (*Magan, supra,* 105 Cal.App.4th at p. 475), an agency will often have to conduct a fairly extensive preliminary review to develop substantial evidence that there will be no significant effect on traffic, noise, air quality or water quality for a project that appears to fall under the urban in-fill exemption. Although there may be some theoretical objection to the performance of such a study at the preliminary review stage, the need to perform a thorough analysis "simply to determine whether an activity is subject to CEQA in the first instance" "is not absurd when we consider the principles that a[n] . . . exemption . . . should be strictly construed [citation], and that such strict construction allows

D

*Substantial Evidence Supports the City's Determination That
the Urban In-fill Exemption Applied According to Its Terms*

We now turn to an analysis of the City's determination that the urban in-fill exemption applies by its own terms.

In concluding that the elements of the urban in-fill exemption were present in this case, the City made a number of subsidiary findings. At issue here are three of those findings: (a) the Project is substantially surrounded by urban uses, (b) the Project is consistent with the applicable general plan, and (c) the Project would not result in any significant effects relating to traffic. We examine each of these findings in turn.

1. *Substantially Surrounded by Urban Uses*

The first finding that the Preservation Group challenges is that the Project will be developed on a site *"substantially surrounded by urban uses."* (Guidelines, § 15332(b), italics added.) The Preservation Group points out that although the Project will be surrounded by urban buildings to the east, north and west, the corner of Balboa Park will be directly to the south of the Project, across Upas Street. The Preservation Group argues that Balboa Park is not an "urban use," and thus the Project will not be "substantially surrounded by urban uses."

We have not located or been directed by the parties to any authority interpreting the phrase "substantially surrounded by urban uses" as it appears in the urban in-fill exemption.[20] Thus, to inform our analysis we turn to case law that has defined the term "urban uses" in the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.).[21] According to case law there defining the term "urban uses," "[t]he term 'urban' is 'not fixed, objective, or

---

CEQA to be interpreted ' "in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' . . . [I]t is not unreasonable to require a consideration of the issue of significant environmental effects at the preliminary review stage [citation] when the agency assesses the applicability of a categorical exemption." (*East Peninsula Ed. Council, Inc. v. Palos Verdes Penninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 171 [258 Cal.Rptr. 147], fn. omitted.)

[20] As we have explained above, the interpretation of the terms used in a categorical exemption is a question of law, to which we apply a de novo standard of review. (*Fairbank, supra,* 75 Cal.App.4th at p. 1251.)

[21] The Community Redevelopment Law contains the phrase "urban uses" because it covers "blighted area[s]" that are " 'predominantly urbanized,' " which is defined to mean that "not less than 80 percent of the land in the project area: (1) Has been or is developed *for urban uses*; [¶] . . . [¶] or (3) Is an integral part of one or more areas developed *for urban uses* which

easily ascertainable,' " but it has been " 'defined as "of, relating to, characteristic of, or taking place in a city . . . constituting or including and centered on a city . . . of, relating to, or concerned with an urban and [specifically] a densely populated area . . . belonging or having relation to buildings that are characteristic of cities . . . ." ' " (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 541, 544 [98 Cal.Rptr.2d 334] (*Friends of Mammoth*) [as part of a CEQA analysis, determining whether a series of proposed projects related to "urban uses" under the Community Redevelopment Law].) Accordingly, "[t]he term 'urban' . . . refers *more to the location and 'varying characteristics' of a use* than to the *type* of use. [Citation.] For example, a residential dwelling can exist either in an urban area or in a rural area. . . . [¶] So it is with golf courses." (*Id.* at p. 545, italics added.) The *Friends of Mammoth* court, for instance, analyzed whether the golf course at issue was an urban use or a rural use by analyzing its specific characteristics and location. Because it contained "significant amounts of natural and preserved forest lands" and was "surrounded by undeveloped forest land," the court determined that it was not "related to or characteristic of a city or a densely populated area," and thus not an urban use. (*Ibid.*)

We apply the *Friends of Mammoth* approach to determine whether Balboa Park should be considered an urban use. Doing so, we focus on the fact that Balboa Park is a quintessential urban park, heavily landscaped, surrounded by a densely populated area, and containing urban amenities such as museums, theaters and restaurants. Accordingly, it is "characteristic of a city or a densely populated area," and we conclude that it constitutes an urban use. Having determined that Balboa Park is an urban use, we reject the Preservation Group's argument that, due to its frontage on Balboa Park, the Project is not "substantially surrounded by urban uses."[22]

## 2. *Consistency with the General Plan*

We next examine whether substantial evidence supports the City's finding that the Project "is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations." (Guidelines, § 15332(a).) The Preservation

---

are surrounded or substantially surrounded by parcels which have been or are developed *for urban uses.*" (Health & Saf. Code, § 33320.1, italics added.)

[22] We need not and do not reach the issue of whether development that is admittedly surrounded on *three sides* by urban uses would nevertheless not be "*substantially* surrounded" by urban uses if it is fronted by a nonurban use on the *fourth* side.

Group does not challenge the Project's compliance with zoning requirements, but argues that the Project does not comply with the Uptown Community Plan adopted by the City Council in 1988 and amended in 1989 (the Plan).

The Preservation Group makes two arguments centering on the setback of the building and its effect on views of Balboa Park. It first points to a statement in the Plan dealing with general urban design guidelines, which states that "[d]evelopments on corner lots of existing streets which serve as public view corridors for vistas and open space need special design considerations such as being required to setback from the corner or terrace away from the street." Based on this language, the Preservation Group argues that the Project is inconsistent with the Plan because "it has been unnecessarily crammed into the southern end of the lot with a minimized setback from the corner and the park." Similarly, the Preservation Group points to the Plan's stated objective in the Park West area of San Diego (in which the Project is located) to "[m]aintain and enhance pedestrian and auto views of Balboa Park." The Preservation Group argues that the Project is inconsistent with this objective because it is insufficiently set back to maintain views of Balboa Park from southbound Sixth Avenue. As we will explain, we reject these arguments and determine that substantial evidence supports the City's finding that the Project is consistent with the applicable planning documents, which, as quoted above, express a general policy in favor of using setbacks to maintain view corridors.

Our conclusion is based in large part on the fact that the record contains evidence that the Project's setbacks *more* than comply with the specific applicable setback zoning provisions. Specifically relevant to the views of Balboa Park from Sixth Avenue, the Project provides a 12.5-foot setback from the property line along Upas Street where only a five-foot setback is required. Further, there will be a 20-foot setback from the face of the easterly curb on Sixth Avenue. A diagram in the record shows that because of these setbacks, drivers proceeding south on Sixth Avenue will have a view across Upas Street and to the east toward Balboa Park from at least 68 feet from the intersection with Upas Street. The use of setbacks that exceed the applicable requirements, along with evidence in the record showing that there will be sight lines of Balboa Park for southbound drivers, lead us to conclude that substantial evidence supports the City's conclusion that the Project is consistent with the Plan's policy in favor of using setbacks to maintain view corridors.

The Preservation Group also contends that the Project is inconsistent with the Plan's statement that "development adjacent to the north side of Balboa Park should be low density, residential uses." However, the record shows that this policy does not apply to the northeast corner of Upas Street and Sixth

Avenue, where the Project is located. A map in the Plan shows that the low density area is located adjacent to the north end of Balboa Park *east* of Seventh Avenue and on the other side of the highway that cuts through Balboa Park. Further, other maps in the Plan show that the corner of Upas Street and Sixth Avenue is contained in a "very high density" area.[23] We accordingly conclude that the Plan does not place the Project in a low density area, and the Project is thus not inconsistent with the Plan due to its density.

### 3. *No Significant Effects on Traffic*

Turning to the next element of the urban in-fill exemption, we analyze whether substantial evidence supports the City's finding that "[a]pproval of the project would not result in any significant effects relating to traffic . . . ." (Guidelines, § 15332(d).) As we have discussed above, in reviewing the City's finding we apply a traditional substantial evidence standard of review rather than the fair argument standard. (See pt. II.C.2, *ante*.) Thus, we will affirm the City's findings if the record contains substantial evidence that the Project will cause no significant effect relating to traffic, even if other evidence arguably supports a different conclusion.

The Preservation Group presents several arguments concerning the Project's impact on traffic—all of which we reject based on the following analysis.

### a. *The Offset Intersection*

First, the Preservation Group argues that the Project would have a significant effect on traffic because it will be located at a dangerous intersection. Specifically, the Preservation Group argues that the intersection of Sixth Avenue and Upas Street is an "offset" intersection: (1) Sixth Avenue does not line up to the north and south of Upas Street, with Sixth Avenue jogging to the west as it continues in front of the Project; and (2) Upas Street does not

---

[23] We note that the maps we rely on show that the Project is on the *border* of the very high density area. One map draws the border slightly differently and shows the Project as being just *outside* of the very high density area (but not in a low density area, in any event). To the extent that the Plan contains any ambiguity, we defer to the City's interpretation of its own Plan. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 [104 Cal.Rptr.2d 326] [in reviewing "an agency's decision for consistency with its own general plan, we accord great deference to the agency's determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those polices when applying them in its adjudicatory capacity"].)

line up on either side of Sixth Avenue, with a third street—Balboa Drive, being directly across Sixth Avenue from the western portion of Upas Street. The Preservation Group also cites testimony from several residents attesting to the dangerous nature of this offset intersection. For example, residents explained that drivers use excessive speeds, that the signage is confusing and that accidents occur at the intersection when traffic northbound on Sixth Avenue fails to veer west at the offset intersection and runs into the lot on which the Project will be located. In contrast, police department accident records show only two reported accidents near the intersection in a one-year period, and only two accidents in the previous five years. None of the reported accidents involved drivers running into the lot where the Project will be located.

■ The observation of local residents that accidents (even if unreported) have occurred at the intersection may be properly considered here. " 'In the context of an administrative hearing, "relevant personal observations are evidence. For example, an adjacent property owner may testify to traffic conditions based upon personal knowledge." ' " (*Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1351–1352 [272 Cal.Rptr. 372]; see also *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928 [21 Cal.Rptr.3d 791] ["Relevant personal observations of area residents *on nontechnical subjects* may qualify as substantial evidence" (italics added)].) However, although local residents may testify to their *observations* regarding existing traffic conditions, "in the absence of a specific factual foundation in the record, dire predictions by nonexperts *regarding the consequences of a project* do not constitute substantial evidence." (*Gentry, supra,* 36 Cal.App.4th at p. 1417, italics added.) "Unsubstantiated opinions, concerns, and suspicions about a project, though sincere and deeply felt, do not rise to the level of substantial evidence . . . ." (*Leonoff,* at p. 1352.) Thus, "project opponents must produce . . . evidence, other than their unsubstantiated opinions, that a project *will produce a particular adverse effect*." (*Ukiah, supra,* 2 Cal.App.4th at pp. 735–736, italics added.)

Here, although the testimony of the local residents arguably provides some evidence of the dangerous nature of the intersection, the record contains no factual foundation for the claim that the Project would *exacerbate* that condition for pedestrians and drivers. To the contrary, a study by a traffic engineer concluded that "the [P]roject does not create a significant impact at the intersection of Sixth Avenue and Upas Street and there are no 'safety' or sight distance problems at the intersection." Diagrams in the record show that sight lines for drivers will not be substantially impacted by the Project, with

drivers proceeding south on Sixth Avenue and turning east onto Upas Street and drivers proceeding west on Upas Street and turning north onto Sixth Avenue able to see across the intersection from 68 feet back. Pedestrian sight lines of the intersection will also not be obstructed. Further, the intersection is controlled with traffic lights, minimizing the risk that an accident, involving either pedestrians or only vehicles, will be caused by any diminished ability to see cross-traffic. Because the Project's design calls for the placement of a series of 36-inch-tall planters along the southern and western perimeter of the site, it also takes account of the possibility that drivers northbound on Sixth Avenue will cause substantial damage if they drive onto the property. The Preservation Group presented no evidence to counter any of these points.

Instead, the Preservation Group argues that the Project will have a significant effect on traffic because it will foreclose the City from taking certain *future* steps to address problems at the intersection, such as constructing a traffic circle, widening the sidewalks or other measures. This argument suffers from the same flaws as the Preservation Group's argument about the exacerbation of the dangerous conditions at the intersection: It is based solely on unsubstantiated lay opinion. Except for the nontechnical and unsupported lay opinion of one local resident, the record contains no evidence that the Project will foreclose the City from taking meaningful steps in the future to address any dangerous conditions that it perceives at the intersection. The record also contains the report from the City Manager, which states that it is not reasonably foreseeable that the Project would impact any plans to adjust the intersection, because no plans have been adopted. This report provided a further basis for the City to reject the Preservation Group's argument.

Based on the above, we conclude that substantial evidence supports a finding that the Project will not have a significant effect on traffic relating to the offset intersection.

b. *Traffic Concerns Relating to the Alley*

The Preservation Group makes several points related to the alley located behind the Project. The alley is located to the north of the Project and connects Sixth Avenue and Seventh Avenue. It provides access to parking spaces for nearby apartment buildings and is where the entrance and exit to the underground parking garage for the Project will be located.

The Preservation Group argues that it will be dangerous for drivers to turn onto Sixth Avenue when exiting from the alley because the Project will block a driver's view of cars driving north on Sixth Avenue. However, as the record indicates, the City Manager explained that the Project fully complies with the City's requirements for visibility areas at the street and alley intersections.

Next, the Preservation Group argues that it is dangerous for drivers to enter the alley when driving southbound on Sixth Avenue if they illegally cross a double yellow line or make a dangerous U-turn at Upas Street to do so. However, the difficulty of turning left into the alley from Sixth Avenue is not a condition caused by the Project and exists whether or not the Project is built. Moreover, as the Preservation Group recognizes, the safest way to enter the alley from southbound Sixth Avenue is to make a left turn at the traffic signal on Upas Street and enter the alley from Seventh Avenue. The Project does not preclude that approach.

Finally, the Preservation Group also suggests that congestion in the alley will "interfere with the residents of the apartments on the other side of the alley who must park in stalls along the mid-block alley." However, as the City Manager explained, while the Project would be expected to generate some additional traffic in the alley, it would not be a significant addition, because the Project would be expected to generate an average of only seven trips in the morning peak hours and eight trips in the afternoon peak hours. Further, the Project would improve congestion problems in the alley by dedicating an additional five feet of property to widen and improve the existing 15-foot-wide alley.

Based on this evidence, we conclude that substantial evidence supports the City's finding that the Project would not cause any significant effects on traffic as related to the alley to the north of the Project.

### c. *Effects on Parking*

The Preservation Group argues the Project will have a significant adverse impact on the availability of parking spaces in the neighborhood, which are already limited because of the proximity of Balboa Park and parking congestion caused by events held at the Marston House.

The records shows that the Project will provide 28 parking spaces (two for each of the 14 units), which is more than the required 25 spaces mandated by applicable requirements. The Preservation Group nevertheless argues that the Project will negatively impact the availability of neighborhood parking

(1) because it does not designate any additional space for visitor parking, and (2) it will cause the elimination of three on-street parking spaces.[24]

We conclude that there may be some small effect on the availability of on-street parking because of the loss of three on-street parking spaces and the parking needs of visitors to the 14 single-family residences in the Project. However, the effect cannot be described as "significant." A significant effect is a "substantial, or potentially substantial, adverse change." (CEQA, § 21068; Guidelines, § 15382.) Under the Guidelines, a project will normally have a significant effect on the environment if it will "[c]ause an increase in traffic which is *substantial in relation to* the existing traffic load and capacity of the street system." (Guidelines, appen. G, § XV(a), italics added.) The slight increase in parking congestion that may result from the Project will not be "substantial" in relation to the preexisting parking congestion in the area as described in the record. (*Fairbank, supra,* 75 Cal.App.4th at p. 1260 ["While the addition of any small building to a fully developed downtown commercial area is likely to cause minor adverse changes in the amount and flow of traffic and in parking patterns in the area, such effects cannot be deemed 'significant' without a showing of some feature of the project that distinguishes it from any other small, run-of-the-mill commercial building or use"]; *City of Orange v. Valenti* (1974) 37 Cal.App.3d 240, 249 [112 Cal.Rptr. 379] [if a project concerns "a commercial area of such character that a few dozen additional cars (or a few hundred depending on the economy) would be expected to be a logical part of that local environmental picture, it could then be said that the [project] would have no significant effect on the environment of that particular area"].)

E

*Substantial Evidence Supports the City's Determination That There Is No Reasonable Probability of a Significant Effect on the Environment Due to Unusual Circumstances*

We next examine the City's finding that "there is no reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances" under Guidelines section 15300.2(c). As we have explained above, the fair argument standard applies to our analysis. (See pt. II.C.1.b, *ante.*)

---

[24] The loss of three on-street parking spaces on Sixth Avenue is due to the widening of the alley, the creation of a red-painted curb area for fire truck access, and the designation of a space for postal service parking.

The Preservation Group argues there are "unusual circumstances" in this case, making Guidelines section 15300.2(c) applicable, because the Project (1) is adjacent to Balboa Park; (2) is located near houses that are designated as historic; (3) abuts the Del Prado condominium building and will impact its residents' views; and (4) sits at a dangerous offset intersection. The Preservation Group contends that due to these purportedly unusual circumstances, there is a reasonable possibility that the Project will significantly effect (1) shadowing of Balboa Park, (2) views, (3) traffic, and (4) "community character."

 The application of Guidelines section 15300.2(c) involves two distinct inquiries. First, we inquire whether the Project presents unusual circumstances. Second, we inquire whether there is a reasonable possibility of a significant effect on the environment *due to* the unusual circumstances. (*Azusa, supra*, 52 Cal.App.4th at p. 1207 [the unusual circumstances test is satisfied "where the circumstances of a particular project (i) differ from the general circumstances of the projects covered by a particular categorical exemption, and (ii) those circumstances create an environmental risk that does not exist for the general class of exempt projects"].) "A negative answer to either question means the exception does not apply." (*Santa Monica Chamber, supra*, 101 Cal.App.4th at p. 800.)

Instead of beginning our inquiry with an analysis of whether the various circumstances identified by the Preservation Group qualify as "unusual," in this case our inquiry will be streamlined if we proceed directly to the question of whether, applying the fair argument standard, there is a reasonable possibility of a significant effect on the environment due to any of those purported unusual circumstances.

### 1. Shadows

We first address the Preservation Group's contention that due to the Project's location across from Balboa Park, there is a reasonable possibility that the Project will significantly affect the environment by casting shadows on Balboa Park that will harm the park's vegetation.

We reject this argument because the record does not contain evidence creating a fair argument that the shadows cast by the Project will have an adverse effect on the park's vegetation. We reach this conclusion keeping in mind that as the party challenging the exemption, it is the Preservation Group's burden to produce substantial evidence establishing an exception to the urban in-fill exemption. (*Santa Monica Chamber, supra*, 101 Cal.App.4th at pp. 795–796.)

The record contains shadow diagrams showing the shadows that would be cast by the Project. As the City Manager explained, interpreting these diagrams: "On June 21, the shadow created by the proposed [P]roject extends to the southeast, crossing Upas Street at 5:00 p.m. and ultimately extending 130 feet into Balboa Park by sunset." However, due to the movement of the sun throughout the year, the Project would cast a shadow *to the north*, rather than to the south into Balboa Park, at other times of the year.

The Preservation Group submitted no evidence showing that the park's vegetation would be impacted by the shadow created by the Project on summer evenings. To the contrary, the only evidence in the record on that subject suggested no significant effect. The record contains evidence that there was no known significant impact on the vegetation on the *west* side of Balboa Park due to the construction of buildings there, and the City's horticulturalist for Balboa Park stated that because of the movement of the sun, "it seems fair to assume that the construction of a building on the *north* end of the park," where the Project is located, "will have less of an impact than any changes in the buildings on the [*w*]*est* side of [Sixth] Avenue." (Italics added.)[25] Accordingly, we conclude that the record does not contain substantial evidence supporting a fair argument of a significant effect on the vegetation in Balboa Park.

## 2. *Views*

The Preservation Group argues that due to the Project's location next to the Del Prado, views to the west from that building will be blocked. We reject this argument because "obstruction of a few private views in a project's immediate vicinity is not generally regarded as a significant environmental impact." (*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 586 [18 Cal.Rptr.3d 814]) "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492–493 [14 Cal.Rptr.3d 308].)[26]

---

[25] The horticulturalist stated she was unable to offer an opinion on the degree, if any, to which existing trees would be impacted by the Project, but explained that a licensed consulting arborist could give such a opinion. The Preservation Group did not submit a study by a licensed consulting arborist.

[26] The exception set forth in Guidelines section 15300.2(c) does not apply to the environmental impacts caused by the Project's location next to the Del Prado for the additional reason that the location next to the Del Prado is not an unusual circumstance as is required for the exception to apply. The location of urban in-fill construction next to another building, which might result in blocked views, is not an unusual circumstance for urban in-fill construction, as such construction normally takes place in an already built-up urban environment. "[W]hether a circumstance is '*unusual*' is judged relative to the *typical* circumstances related to an otherwise typically exempt project." (*Santa Monica Chamber, supra,* 101 Cal.App.4th at p. 801.)

The Preservation Group also argues that there is a reasonable possibility that the Project's location next to Balboa Park will negatively impact the public's view of Balboa Park from Sixth Avenue. However, as we have explained, the record shows that sight lines down Sixth Avenue will be preserved to a reasonable extent. The views of Balboa Park from Sixth Avenue will not be impacted in any way that can be fairly described as "significant" or "substantial."

The Preservation Group also contends that view from inside Balboa Park looking north will be negatively impacted because the view will consist of a wall of tall buildings. However, we agree with the City that the view toward the lot where the Project will be built, as shown from photographs in the record, consists of an unremarkable urban street, not a "scenic vista" with aesthetic qualities. (See Guidelines, appen. G, § I(a) & (c) [in deciding whether to prepare a negative declaration an agency may ask whether a project would "[h]ave a substantial adverse effect on a scenic vista" or "[s]ubstantially degrade the existing visual character or quality of the site and its surroundings"].) Further, the view already contains the Del Prado, which is three and a half times wider than the Project and substantially the same height. In light of these facts, it cannot be fairly argued that the existing character of the view looking north from Balboa Park will be significantly affected by the Project.

### 3. *Community Character*

Relying on the alleged inconsistency of the Project with the Plan's objectives for development adjacent to Balboa Park, the Preservation Group argues that the Project would "have significant impacts with respect to community character." However, as we have discussed above, the Project is consistent with the Plan. The Preservation Group further argues that the Project would significantly impact community character because it "would be the only building higher than four stories on the east side of [Sixth] Avenue between Elm and University." This argument ignores the fact that the Del Prado, while one lot removed from Sixth Avenue, is substantially higher than four stories, and that the Project will be consistent with the community character already established by the Del Prado.

### 4. *Traffic*

Finally, the Preservation Group makes the identical arguments that we have already discussed above with respect to traffic impacts. In support of the "unusual circumstances" component of the exception, the Preservation Group argues that the unusual circumstances consist of (1) the proximity to Balboa Park and the Marston House, which causes parking problems and high

pedestrian traffic, and (2) the allegedly dangerous nature of the offset intersection. We do not reach the issue of whether these circumstances are unusual. Instead, we determine, with reference to our discussion above, that the City correctly determined that there is no reasonable possibility of a significant effect on traffic from the Project.

In reaching this conclusion, we consciously apply a different standard than we applied in determining whether the elements of the urban in-fill exemption were met. Here, we ask whether the record contains any substantial evidence supporting a fair argument that the Project will have a significant effect on traffic. (See pt. II.C.1.b, *ante*.) Applying that standard to the traffic issues discussed above, we conclude that the record does not support a fair argument that the Project (1) will exacerbate any dangerous conditions to drivers and pedestrians posed by the offset intersection, (2) will cause dangerous conditions or substantial amounts of congestion regarding the alley to the north of the Project, or (3) will have a significant effect on the parking problems in the neighborhood.

F

*There Is No Merit to the Preservation Group's Argument*
*That the City Impermissibly "Piecemealed" the Approval of*
*the Project*

Focusing on the fact that the City issued shoring, grading and pad footings permits before it undertook its analysis of whether the Project was exempt from CEQA, the Preservation Group argues that the City impermissibly approached the CEQA analysis of the Project in a "piecemeal" manner. The Preservation Group relies on case law holding that "[a] public agency is not permitted to subdivide a single project into smaller individual subprojects in order to avoid the responsibility of considering the environmental impact of the project *as a whole*." (*Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1171 [227 Cal.Rptr. 688], italics added; see also *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1358 [111 Cal.Rptr.2d 598].) The rationale behind the "piecemealing" prohibition is that " '[t]he requirements of CEQA[,] "cannot be avoided by chopping up proposed projects into bite-size pieces which, individually considered, might be found to have no significant effect on the environment or to be only ministerial." ' " (*Orinda*, at p. 1171.) In this case, the Preservation Group's argument is that the shoring, grading permit, and pad

footings permits should *not* have been issued as ministerial matters *separate* from the Project because they were an inseparable part of the Project.[27]

■ We reject this argument on the ground that the Preservation Group failed to object to the City about the alleged piecemeal treatment of the Project and thus failed to exhaust its administrative remedies. CEQA states that an action may not be brought to challenge an agency's decision "unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing." (CEQA, § 21177(a).)

The Preservation Group never raised the issue of piecemealing to the City.[28] The best it can do is to point to an unclear comment at the City Council hearing by a member of the public, who stated, "Now there ha[s] also been *a project splitting*, ignoring environmental issues such as traffic and light, ignoring unusual issues as being located directly by the entrance of Balboa Park, ignoring the cumulative effects and so on." Although the Preservation Group "may assert any issues raised by *other* parties during the administrative proceedings" (*Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1119 [71 Cal.Rptr.2d 1], italics added), we do not perceive this isolated and unelaborated comment by a member of the public as fairly raising the piecemealing argument to the City. "[O]bjections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them. Otherwise, the purpose of the exhaustion doctrine would not be served, since the courts would be called upon to step outside their limited role of reviewing the decisionmaking process of the administrative agency . . . ." (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1140 [27 Cal.Rptr.3d 675]) Accordingly, we conclude that the Preservation Group may not advance the piecemealing argument in this proceeding because the issue was not fairly presented to the City.

---

[27] The arguably more logical counterperspective, of course, is that the City issued the initial permits because, at the time, it viewed the *whole* of the Project as only requiring ministerial approvals (as the Project was proposed as an apartment building at the time), not because it viewed the grading, shoring and pad footings permits as *separable* from the Project. It was not until the Preservation Group objected to the lack of a CEQA review that the City undertook a more detailed analysis of the Project.

[28] The Preservation Group points out that its attorney stated at the City Council hearing that the Project has "a full head of steam [be]cause they went ahead and they dug the hole." Because this comment does not assert that the City has treated the grading, shoring and pad footings permits as *separate* from the rest of the Project, we do not perceive it as raising a piecemealing argument. The Preservation Group also argues that it clearly objected that the initial permits were issued without environmental review. Such objections, however, cannot be interpreted as raising a piecemealing argument. An objection that all of the permits issued to date were issued without environmental review does not equate to an objection that those permits were treated as *separate* from the rest of the Project.

## DISPOSITION

The order is affirmed.

McConnell, P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied May 25, 2006.