[No. C064280. Third Dist. Oct. 4, 2012.]

VOICES FOR RURAL LIVING, Plaintiff and Appellant, v.
EL DORADO IRRIGATION DISTRICT, Defendant and Respondent;
SHINGLE SPRINGS BAND OF MIWOK INDIANS, Real Party in Interest
and Appellant.

### COUNSEL

Law Offices of Stephan C. Volker, Stephan C. Volker and Alexis E. Krieg for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Sonnenschein Nath & Rosenthal, SNR Denton US, Paula M. Yost and Matthew G. Adams for Real Party in Interest and Appellant.

### OPINION

**NICHOLSON, J.**—Defendant El Dorado Irrigation District (EID) entered into an agreement to provide water to a casino located on tribal land held by real party in interest Shingle Springs Band of Miwok Indians (the Tribe). EID determined the agreement was exempt from environmental review under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA) pursuant to a categorical exemption for small construction projects. EID made this finding even though the agreement called for it to provide significantly more water than it had provided previously to the land.

EID also determined the agreement was not subject to certain conditions limiting the amount of water it could provide to the tribal land that were imposed years earlier by the El Dorado County Local Agency Formation Commission (LAFCO) when the land was first annexed into EID. The agreement called for providing significantly more water than the annexation

conditions allowed. EID determined the annexation conditions were unconstitutional, and, relying upon that determination, approved the agreement and its obligation to provide quantities of water that greatly exceeded those allowed by the conditions.

Plaintiff Voices for Rural Living (VRL) filed a petition for writ of mandate to vacate EID's approval of the agreement. VRL claimed EID violated CEQA because the small projects categorical exemption on which EID had relied did not apply. VRL also claimed EID exceeded its authority when it disregarded the annexation conditions.

The trial court granted VRL's petition and voided EID's approval of the agreement. It determined EID erred in concluding the project was exempt from CEQA. It found the project's unusual circumstances triggered an exception to the small projects categorical exemption on which EID had relied. The project was thus not exempt from CEQA, and the court ordered EID to prepare an environmental impact report (EIR) to analyze the project.

The trial court also determined EID erred by approving the agreement in violation of the annexation conditions. It held EID had no authority to disregard the annexation conditions or determine their constitutionality.

Both the Tribe and VRL appeal. EID does not appeal. The Tribe claims the trial court's holdings are incorrect, and VRL claims the court erred by not reaching additional issues it claims it raised.

Except to reverse solely on the nature of the relief the trial court ordered, we affirm the judgment. As to the CEQA issues, we conclude the trial court correctly determined the project did not qualify for the small projects categorical exemption because the project's unusual circumstances created a potential for environmental impact and thus triggered an exception to the categorical exemption. VRL's request for additional relief under CEQA is mooted by our affirming the judgment, and in any event is barred by VRL's failure to raise its arguments first to EID and thereby exhaust its administrative remedies.

As to the issues surrounding the annexation conditions, we conclude the trial court correctly determined EID had no authority to adjudicate the conditions' constitutionality or disregard their application to the proposed agreement. Because this ground is dispositive of the annexation condition issues raised on this appeal, we do not reach the parties' other arguments.

We direct the trial court to order EID to conduct further proceedings in accordance with CEQA.

## FACTS

The Tribe is a sovereign, federally recognized Indian tribe. The United States government holds land in trust for the Tribe. The land, known as the Shingle Springs Rancheria (Rancheria), consists of approximately 160 acres located in El Dorado County, just north of U.S. Highway 50 between Shingle Springs and Placerville.

Prior to 1987, the Tribe acquired water for the Rancheria residents from EID at out-of-district rates. In 1987, the Tribe and EID entered into an annexation agreement to bring the Rancheria into EID's service area. Under the agreement, EID would "provide water service to Rancheria residents on the same terms as it provides service to any other resident within the District." The agreement was subject to approval by LAFCO.

LAFCO approved the annexation in 1989, but it conditioned its approval by restricting the types of land uses EID could serve on the Rancheria. LAFCO authorized EID to supply water to the Rancheria only for residential and accessory uses, and only in an amount necessary to serve a community of no more than 40 residential lots. LAFCO reserved jurisdiction to amend or eliminate the conditions. Neither the Tribe nor EID have ever formally challenged these conditions, but the Tribe has disputed their validity in the most recent negotiations with EID.

The Tribe proposed constructing a casino and hotel on the Rancheria pursuant to the Indian Gaming Regulatory Act (25 U.S.C. § 2701 et seq.). The Tribe also proposed an interchange connecting the Rancheria to U.S. Highway 50. The National Indian Gaming Commission (NIGC) and the federal Bureau of Indian Affairs (BIA) reviewed the proposed casino and hotel's environmental impacts pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.; NEPA). California's Department of Transportation (Caltrans) did the same for the proposed interchange pursuant to CEQA and NEPA. Both reviews discussed the issue of water supply for the project.

The environmental assessment (EA) prepared by the NIGC and the BIA in 2001 for the casino and hotel explained there were two options for delivering water to the project: having water supplied and delivered by EID through an existing three-inch water meter, or having water trucked to the site on a daily basis by a private company. According to the 2001 EA, the project would require an estimated 98,000 gallons per day to meet peak demand, and 75,700 gallons per day to meet average demand. The firm peak day requirement was estimated to be 70 gallons per minute.

The existing three-inch water meter is capable of delivering a maximum continuous flow of 250 gallons per minute. It thus had sufficient capacity to

deliver the projected peak day flows of 70 gallons per minute. The 2001 EA noted, however, that the dispute over the validity of the annexation conditions LAFCO imposed on EID's delivery of water to the Rancheria would have to be resolved before EID could supply the additional water.

Assuming the dispute over the LAFCO conditions could be resolved, the 2001 EA concluded EID's delivering water to the Rancheria would have a less than significant impact on the provision of public services. It also concluded the project would create no cumulative impacts on the provision of public services because the project would be accommodated by existing and planned water supplies.

If the dispute over the LAFCO conditions could not be resolved, the Tribe would have to truck water into the Rancheria to serve the casino and hotel. The 2001 EA estimated this form of delivery would require 25 truck trips per day to provide sufficient water.

The parts of the 2001 EA included in the record do not analyze or discuss any impacts on the physical environment that could be caused by either method of water delivery.

The EIR prepared by Caltrans in 2002 for the proposed interchange on U.S. Highway 50 simply relied upon the 2001 EA's conclusion of a less than significant impact on water supply for its discussion of effects caused by delivering water to the casino.

Relying on these reviews, the federal and state agencies approved the casino and interchange projects. Litigation against both environmental documents ran its course, and the casino and interchange have been constructed and are in operation today.

Meanwhile, controversy arose in 2002 concerning LAFCO's conditions on EID's provision of water to the Rancheria. The Tribe sought increased water service from EID, but EID adhered to the restrictions. At the request of two state legislators, the Legislative Counsel of California issued two opinions addressing the validity of LAFCO's conditions. The first opinion concluded the restrictions were valid under state law. The second opinion more generally concluded LAFCO's were not authorized to make land use decisions involving sovereign tribal lands.

At the end of 2002, and after reviewing the opinions from the Legislative Counsel, EID reaffirmed its position that the conditions imposed by LAFCO were valid.

The Tribe threatened civil rights litigation against EID to challenge its enforcement of the conditions. In 2004, EID and the Tribe entered into a tolling agreement to forestall the litigation, and they continued settlement discussions.

In 2008, the Tribe provided EID with a legal analysis prepared by the Office of the Solicitor for the federal Department of the Interior regarding the enforceability of LAFCO's conditions. Responding to a request for that analysis by the Tribe, the solicitor wrote: "[W]here LAFCO conditions respecting water delivery to the Tribe's Rancheria are concerned, an issue of fact might be whether the conditions were intended to regulate use of the Rancheria, or whether the conditions were serving an objective that is not preempted by federal law prescribing how federal land is to be used. There appears to be some evidence the LAFCO conditions were imposed even though water was available for delivery to the Rancheria, which suggests the conditions may have been imposed, at least in part, to regulate use of the land. Moreover, the conditions limit use of the land to 'residential use' for 'a community of forty residential lots'. In the event the record reflects that the conditions imposed by LAFCO regulate land use rather than water delivery, we agree a court is likely to find the LAFCO conditions are preempted by federal law because they conflict with the federally prescribed use of the land."

Armed with this opinion, EID decided to change its position regarding the validity of the LAFCO conditions and enter in a memorandum of understanding (MOU) to provide water to the Rancheria in an amount that exceeded the amounts LAFCO authorized. Counsel for EID, relying on the solicitor's analysis, concluded the LAFCO restrictions were invalid, and EID's board of directors approved the MOU with the Tribe on May 28, 2008.

Under the MOU, EID agreed to provide water to the Rancheria at a maximum rate of 95 gallons per minute, with a total average volume of 135,000 gallons per day. For purposes of determining EID's compensation for the water, the MOU calculated the total water usage by the Rancheria to equal 260.74 equivalent dwelling units (EDU's): 45 EDU's for the existing service and an additional 215.74 EDU's for the increased service to the casino.

The water would be drawn from existing sources and delivered through existing pipelines. The only necessary physical improvements would be relocating the existing three-inch water meter, which would continue to be the single point through which EID would deliver the water to the Rancheria, and installing a short section of pipeline linking the meter to an existing water main, both of which would occur on tribal land.

In reviewing the project as required by CEQA, EID determined that neither the method of delivery nor the quantity of water to be delivered would result in any significant impact to the environment or to levels of service to any existing EID customers. Accordingly, it issued a notice of exemption from CEQA. The notice stated the project was exempt from CEQA pursuant to a categorical exemption known as a "class 3" exemption for new construction or conversion of small structures (see CEQA Guidelines, Cal. Code Regs., tit. 14, § 15303).[1]

Plaintiff VRL challenged EID's approval of the MOU. In a petition for writ of mandate and complaint for declaratory relief, VRL alleged EID (1) violated CEQA by not performing environmental review on the MOU; (2) violated state law by approving the MOU without evaluating its consistency with El Dorado County's general plan; and (3) violated the Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 (LAFCO Act) (Gov. Code, § 56000 et seq.) by not first securing LAFCO's approval of the MOU and amendment of the conditions LAFCO imposed in 1989 on the Rancheria's annexation into EID.

The trial court granted the petition for writ of mandate. It held EID (1) violated CEQA by concluding the MOU was categorically exempt from CEQA review and (2) violated the LAFCO Act by disregarding LAFCO's conditions of annexation. It further held EID had not violated state law requiring project consistency with general plans.

Regarding the CEQA violation, the court determined there was sufficient evidence to establish the MOU was subject to an exception to the class 3 categorical exemption. Under this exception, a categorical exemption may not be used for a project where there is a reasonable possibility the project will have a significant effect on the environment due to unusual circumstances. (Guidelines, § 15300.2, subd. (c).) The court concluded there was sufficient evidence to support a fair argument that the unusual circumstances exception to the categorical exemption applied here. It ordered EID to prepare an EIR.

Regarding the LAFCO Act violation, the court determined EID had no authority to disregard LAFCO's conditions of annexation. EID was obligated to comply with the conditions as it would a statutory enactment. Moreover, any legal action by EID challenging the conditions was time-barred by a 60-day statute of limitations for reverse validation actions. Furthermore, even if the court could reach the merits of the challenge against the conditions, it would not do so because EID had failed to join an indispensible party, namely LAFCO.

---

[1] All references to "Guidelines" are to the state CEQA guidelines, the regulations which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

The Tribe appeals from the trial court's judgment. It claims (1) EID complied with CEQA and no substantial evidence supports the court's determination that the unusual circumstances exception applies to the MOU; and (2) EID did not violate the LAFCO Act because it had authority to disregard the LAFCO conditions. The Tribe also claims the 60-day statute of limitations does not apply, and LAFCO is not an indispensible party.

EID has not appealed from the judgment.

VRL also appeals from the judgment. It claims (1) the court should also have found that EID's application of a categorical exemption under CEQA was improper under a second exception to the categorical exemption, the existence of significant cumulative impacts; and (2) the court erred by not finding EID was statutorily barred under the validation statutes from challenging the legality of the LAFCO conditions.

## DISCUSSION

## I

### CEQA Claims

### A. The Unusual Circumstances Exception

We turn first to the Tribe's claim that the trial court erred when it concluded sufficient evidence in the record triggered the unusual circumstances exception to the class 3 categorical exemption and required EID to prepare an EIR before approving the MOU. Except to vacate the court's order requiring EID to prepare an EIR, we affirm the court's judgment that substantial evidence exists on which a fair argument can be made that the project may cause a significant effect on the environment, and we direct the court to order EID to conduct further review as required by CEQA.

#### 1. Additional background information

EID staff reviewed the proposed MOU to determine whether it qualified for a categorical exemption from CEQA, and also whether an exception to a categorical exemption would require further CEQA review.[2] Staff determined

---

[2] Development projects may be exempt from CEQA under certain statutory exemptions, or under certain so-called categorical exemptions established in the Guidelines. (Pub. Resources Code, § 21080, subd. (b).) For a categorical exemption to apply, the lead agency must also determine applying the exemption is not barred by one of the exceptions set forth in section 15300.2 of the Guidelines. (Guidelines, § 15061, subd. (b)(2).)

the work to be done under the MOU qualified as a class 3 categorical exemption, an exemption for new construction or conversion of small structures. (Guidelines, § 15303.) This categorical exemption exists for construction and location of limited numbers of new, small facilities or structures, including water mains and other utility extensions of reasonable length to serve such construction. EID's own CEQA regulations define the exemption as one for the construction of conveyance structures consisting of a single pipeline of less than 16 inches in diameter, and related appurtenances where the project will not remove an obstacle to significant growth or utilize a new water supply involving the acquisition of new water rights.

Having concluded the project qualified as a class 3 categorical exemption, EID staff next determined whether an exception applied in this instance to use of the categorical exemption. One possible exception was for unusual circumstances associated with the project. Under this exception, a "categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).)

Staff reviewed the proposed project to determine if it involved any of 20 different types of possible unusual circumstances. Such circumstances ranged from whether the project was in an area of unique habitat to whether it involved a substantial new or increased emission of pollutants to whether it could induce significant growth. Of concern here, one of the possible unusual circumstances staff considered was whether the project would involve a "substantial change in demand for municipal services."

Staff determined the project would not involve any of the 20 possible unusual circumstances it considered. Regarding a significant change in the demand for water, staff concluded EID had adequate water from existing sources to serve the project. According to a 2007 EID report called the "2007 Water Resources and Service Reliability Report," a total of 2,426 EDU's of water were available for sale in EID's western/eastern supply area where the Rancheria is located. According to EID records, sales of water in this area in 2008 accounted for 279.75 EDU's, leaving 2,146.25 EDU's of available water supply to serve the area. The Rancheria's potential new demand, an additional 215.75 EDU's above the 45 EDU's already delivered to the Rancheria, would reduce the supply area's available supply of water by about 10 percent. All of the water to be supplied to the Rancheria would be from existing sources based on existing, approved water rights that had either been subject to previous CEQA analyses or dated from the 19th century.

Based on this analysis, staff determined the unusual circumstances exception did not apply and the MOU qualified for the class 3 categorical

exemption from further CEQA review. Staff concluded the 10 percent increase in water demand from the western/eastern supply area's water sources was not a substantial change in available supplies.

Granting VRL's petition for writ of mandate, the trial court disagreed with the EID staff's analysis and concluded the unusual circumstances exception applied. It applied a fair argument standard of review, and it concluded "substantial evidence before EID raises a fair argument that there is a reasonable possibility that the activity will have a significant effect on the environment due to the unusual circumstances of the greatly increased need for public water services by the Rancheria under all potential circumstances, including drought."

The trial court determined this project's unusual circumstances were that (1) the Rancheria under the MOU would increase its water usage from 45 EDU's to roughly 261 EDU's, an increase of 579 percent; and (2) this usage would utilize 14 percent of EID's uncommitted water supply, not the 10 percent stated by staff based on an overstatement of its available water supplies. The court was also concerned that (3) EID's claim there would be no decrease in levels of service to its customers in times of drought despite providing the increased service to the Rancheria was contrary to EID's 2008 "Drought Preparedness Plan," which said there were potential shortages of 20 percent of water resources during a drought; and (4) EID apparently did not consider in its calculations of available water supply the impact of "instream flow obligations" to which it had recently agreed in regulatory proceedings.

Having found these unusual circumstances, the court concluded the evidence raised a fair argument the project would have a significant effect on the demand for public water services, including in times of drought.

The trial court rejected EID and the Tribe's reliance on the 2001 EA and the 2002 EIR prepared for the casino and interchange as evidence the MOU would not have a significant effect on the environment. The court noted that neither of these documents discussed what impacts, if any, could occur if EID provided the water needed for the casino.

2. *Standard of review*

Our review of EID's determination that the MOU did not trigger the unusual circumstances exception to the categorical exemption involves two questions. "First, we inquire whether the [p]roject presents unusual circumstances. Second, we inquire whether there is a reasonable possibility of a significant effect on the environment *due* to the unusual circumstances. [Citation.]" (*Banker's Hill, Hillcrest, Park West Community Preservation*

*Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 278 [42 Cal.Rptr.3d 537], original italics (*Banker's Hill*).)[3]

The first question, whether the project for which a categorical exemption is being claimed involves unusual circumstances, is an issue of law we review de novo. (*Banker's Hill, supra*, 139 Cal.App.4th at pp. 261–262, fn. 11.)

We resolve the second question, whether there is a reasonable possibility of a significant effect on the environment due to the unusual circumstances, by applying a fair argument standard. (*Banker's Hill, supra*, 139 Cal.App.4th at p. 264.) We are aware there is a split of authority on whether this second question in the analysis should be reviewed under the fair argument standard, as held by *Banker's Hill*, or under the substantial evidence standard. (See, e.g., *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 728–729, fn. 7 [3 Cal.Rptr.2d 488]; *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1601 [275 Cal.Rptr. 901].) The fair argument standard is less deferential to the agency's decision, as it asks us to determine whether there is substantial evidence in the record on which a fair argument can be made that the project may have significant environmental effects. The substantial evidence standard is more deferential to the agency's decision, as it would ask us to determine whether substantial evidence exists to support the agency's decision that the project will not have significant environmental effects.

We are persuaded by the reasoning in *Banker's Hill* that the fair argument standard applies. When CEQA requires an agency to determine whether substantial evidence shows a reasonable *possibility* that the project will have a significant effect on the environment, as opposed to asking the agency to weigh the evidence and come to its own conclusion, the agency and reviewing courts are to apply the fair argument standard. This approach is consistent with the text of, and the policy reasons supporting, CEQA. (*Banker's Hill, supra*, 139 Cal.App.4th at pp. 260–267.) Accordingly, we independently review EID's determination "under Guidelines section 15300.2(c) to determine whether the record contains evidence of a fair argument of a significant effect on the environment." (*Id.* at p. 264.)

### 3. *Project's unusual circumstances*

■ We turn to the first question, whether the project for which a categorical exemption is being claimed involves unusual circumstances.

---

[3] A preliminary question that can arise in these circumstances, that of whether the project qualifies under the terms of the categorical exemption, is not before us, as VRL does not contest that the MOU meets the terms of the class 3 categorical exemption.

" 'The Guidelines do not define the term "unusual circumstances." ' [Citation.] As explicated in case law, an unusual circumstance refers to 'some feature of the project that distinguishes it' from others in the exempt class. [Citation.] In other words, 'whether a circumstance is *"unusual"* is judged relative to the *typical* circumstances related to an otherwise typically exempt project.' [Citation.]" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1381 [44 Cal.Rptr.3d 128], original italics.)

As mentioned above, the exempt class involved in this project is the class 3 categorical exemption. This exemption excludes from CEQA review "construction and location of limited numbers of new, small facilities or structures; installation of small new equipment and facilities in small structures; and the conversion of existing small structures from one use to another where only minor modifications are made in the exterior of the structure." (Guidelines, § 15303.) Examples of the exemption include one single-family residence; a multifamily residential structure totaling no more than four dwelling units; small commercial structures such as stores or restaurants not exceeding 2,500 square feet or, in urbanized areas, four such commercial buildings not exceeding 10,000 square feet; and, of relevance here, "[w]ater main, sewage, electrical, gas, and other utility extensions, including street improvements, of reasonable length to serve *such construction.*" (Guidelines, § 15303, subds. (a), (b), (c), (d), italics added.)

■   This categorical exemption thus applies when the project consists of a small construction project and the utility and electrical work necessary to service that project. EID has further defined the exemption for its purposes as one for the construction of minor conveyance structures and related appurtenances where the project will not remove an obstacle to significant growth or utilize a new water supply involving the acquisition of new water rights.

We conclude the MOU project presents circumstances that are unusual for this categorical exemption. The proposed project's scope, providing 216 additional EDU's of water to a casino and hotel project so large it brings with it its own freeway interchange instead of providing one or four EDU's of water as contemplated by the class 3 categorical exemption is an unusual circumstance under that exemption. The sheer amount of water to be conveyed under the MOU obviously is a fact that distinguishes the project from the type of projects contemplated by the class 3 categorical exemption.

■   The Tribe argues there was no unusual circumstance here because the only possible unusual circumstance was a significant change in demand for municipal services, and it claims the evidence indicates the increase in demand for water under the MOU was not significant. This argument

misunderstands how we are to determine whether an unusual circumstance exists for purposes of applying the unusual circumstance exception to a categorical exemption. We do not look only to the project's possible environmental effects. Rather, we determine as a matter of law whether "the circumstances of a particular project . . . differ from the *general circumstances of the projects covered by a particular categorical exemption . . . .*" (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1207 [61 Cal.Rptr.2d 447], italics added.)

There is no doubt that modifying and relocating a water meter and a pipeline for a casino and hotel development greatly differs from doing the same for a single-family residence, the type of project covered by the class 3 categorical exemption. A small construction project would not normally require an additional 216 EDU's of water delivery or its own freeway interchange. We thus conclude as a matter of law that approving and implementing the MOU involves an unusual circumstance.

### 4. *Possibility of significant effect on the environment*

We turn to the second question in our analysis, whether there is a reasonable possibility of a significant effect on the environment due to the project's unusual circumstances. To answer this question, we review the record as a whole to determine whether it contains any substantial, credible evidence on which a fair argument can be made that a reasonable possibility of a significant effect on the environment exists due to the project's unusual circumstances. We can ask this question another way: Is there substantial evidence of a reasonable possibility that increasing the delivery of EID water to the Rancheria from 45 EDU's to 261 EDU's may have a significant effect on the environment?

██ When we speak of a possible effect on the environment in matters regarding water supply, we are looking to determine whether the evidence shows a possibility that EID will not have sufficient water to meet the needs of this project and its other current and planned customers, and whether providing all of the water promised under the MOU might create impacts to the physical environment. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 421 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

The thrust of VRL's argument is that the project may have an adverse effect on EID's water supply and its ability to provide service, particularly during a drought, and its ability to satisfy certain minimum streamflow requirements which are designed for environmental protection purposes. We conclude VRL's argument is a fair argument supported by substantial evidence.

The evidence in the record attests that EID has sufficient water to meet its demand in normal, nondrought years even while supplying water to the Rancheria casino and hotel. EID's western/eastern supply area, the area of EID in which the Rancheria is located, has a supply of 36,000 acre-feet per year. It has a potential demand of 34,593 acre-feet, leaving it with 1,407 acre-feet of unallocated water, or the equivalent of 2,426 EDU's. As the trial court noted, this amount is further reduced by certain contractual commitments in the amount of 907 EDU's. This leaves, according to EID's numbers, a total of 1,519 EDU's in unallocated water supply, more than enough to meet the casino's increase in demand of roughly 216 EDU's. The Rancheria's increased delivery of water will use approximately 14 percent of EID's unallocated water supply.

However, VRL and the trial court point to evidence regarding the potential effect of a drought in the area that casts sufficient doubt on EID's supply numbers and indicates the project may impact the environment. The possibility of a drought is the environmental status quo and by itself cannot be considered to be a significant effect on the environment. (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 909 [50 Cal.Rptr.3d 799].) If there is a drought, all EID users will be affected and will suffer water cutbacks according to formulas contained in EID's Drought Preparedness Plan. Thus, the issue here is not whether a drought will occur, but whether there is substantial evidence in the record upon which a fair argument could be made that the increase in water to the Rancheria "would cause a drought, exacerbate the severity of a drought, or exacerbate the environmental consequences of a drought . . . ." (*Ibid.*)

There is evidence in the record upon which a fair argument can be made that approving the project could exacerbate the environmental consequences of a drought. This is because despite EID's best efforts to plan for a drought, evidence in the record indicates that even without approving the project, EID will have insufficient supply to meet all of its customer and environmental protection demands—reduced as they will be on account of a drought— during a drought. Agreeing to sell another 14 percent of its water supply under such circumstances may only exacerbate its existing shortage.

VRL and the trial court note EID recognized in its Drought Preparedness Plan that its service area has experienced significant droughts in the past, and it recognized that an increasing population with the resulting increase in water demand will amplify the severity of drought impacts.

The Drought Preparedness Plan, designed to address EID's response to droughts that might occur between 2008 and 2030, also recognizes that EID

is subject to new instream flow requirements (IFR's) imposed by the Federal Energy Regulatory Commission on the South Fork of the American River below Kyburz. These new requirements obligate EID to maintain certain minimum streamflows in "an attempt to re-introduce some of the natural variability of the river system, with peak IFR's in April, May and June corresponding to the historical snowmelt season."

Under the Drought Preparedness Plan, EID will impose voluntary or mandatory cutbacks in water deliveries to all of its customers upon the declaration of a drought. The triggers for declaring a drought, and the scope of the cutbacks needed to respond to the drought, are determined in large part on historical levels of water supply and demand. These historical levels do not account for possible changes in temperatures and levels of precipitation that climate change could produce by 2030.

Scientific analysis performed for the Drought Preparedness Plan concluded that if there were no climate change, the Drought Preparedness Plan would allow EID to deliver the reduced amounts of water it says it can deliver during periods of drought "with 100% reliability." However, if climate change occurs, there will be times during the Drought Preparedness Plan's life "when EID fails to either supply the amount of water that its customers expect under the fluctuating drought stage, or to meet the instream flow obligations it has agreed to in [*sic*] recent regulatory proceedings, depending on which use is given priority."

The analysis pointed out that it was premature in the field of water planning to rely on climate change impact assessments as the sole basis for policy setting and decisionmaking. However, the Drought Preparedness Plan stated the climate change analysis should serve to remind EID "that plausible future conditions associated with climate change expose all future plans and decisions to a level of vulnerability and risk that should be considered as part of rational policy setting."

EID apparently did not give any consideration to this possibility of additional shortages of water during a drought due to climate change when it determined how much of its supply was unallocated and available for use. Its analysis was based simply on past historical use and supply. It thus ignored evidence in the record suggesting it already lacked sufficient water to meet its expected demand during a drought even when it delivers the reduced levels of water it plans to deliver.

In addition, the Tribe points us to no place in the record where EID even considered the impact the new IFR's may have on its supply of unallocated water, whether in normal water years or in drought years. Thus, we do not

have before us a correct or complete picture of how much water EID truly has available to serve the Rancheria.

We are left with only the scant information provided in the record. EID states it is entitled to receive 15,080 acre-feet each year from the South Fork of the American River below Kyburz (called "Project 184"). The new IFR's require EID to ensure that minimum streamflow at that location during a normal to above normal year runs anywhere from 50 cubic feet per second to 240 cubic feet per second, and during a critically dry year it runs from 15 cubic feet per second to 60 cubic feet per second, depending on the month. According to our calculations, based on the fact that one acre-foot of water equals 43,560 cubic feet, EID is obligated to ensure that approximately 77,000 acre-feet pass through the river at that point during a normal year to above normal year, and that approximately 21,600 acre-feet pass there during a critically dry year. Nothing in the record indicates how much, if any, of the 15,080 acre-feet of water EID is entitled to take from the South Fork of the American River will be available after it satisfies these IFR's.

Obviously, these numbers do not reflect the complex and dynamic management of water resources (stored supplies and winter runoff) EID undertakes to satisfy the IFR's and satisfy its customer demand during the course of a year. However, we cite the numbers because they are the only information in the record about the effect of the IFR's, and given their size and without any other information, they suggest a fair argument EID may have difficulty meeting its IFR's and its customer demands during a drought, according to the requirements of its Drought Preparedness Plan. Committing an additional 14 percent of its unallocated water supply to another customer may only exacerbate that condition to the detriment of its customers and the environmental resources the IFR's are designed to protect.

■ This evidence is substantial evidence on which a fair argument can be made that the project with its unique circumstances may have a significant effect on the environment. For this reason, we conclude the trial court correctly determined as such and vacated EID's approval of the project until it could comply with CEQA.

■ We note, however, that the trial court exceeded its authority when it mandated EID to prepare an EIR. How an agency complies with CEQA is a matter first left to the agency's discretion. Having determined the project was not exempt from CEQA, the court should have ordered EID to proceed with further CEQA compliance, which in this case would have been the preparation of an initial study and a determination of whether further environmental review would require an EIR or a mitigated negative declaration. We thus

will reverse the judgment but only on this point to allow the trial court to set aside EID's decision and remand the matter to EID for further consideration under CEQA.

## B.   *Cumulative Impacts Exception*

VRL argues the trial court erred when it did not respond or rule upon VRL's argument that the cumulative impacts exception to the class 3 categorical exemption also barred EID from relying on that exemption and approving the project without further CEQA review.

The Tribe counters that VRL is barred from raising this argument under the exhaustion of administrative remedies rule because no one claimed at EID's hearings on the proposed MOU that the MOU was not exempt from CEQA on account of cumulative impacts.

We need not address VRL's additional ground for affirming the trial court's judgment. Having determined the trial court's ruling under CEQA was correct, we affirm the judgment and need not address additional reasons to affirm.

In any event, VRL was obligated to exhaust its administrative remedies by raising its cumulative impacts argument before EID at the public hearing where EID determined the project was exempt from CEQA. (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285 [142 Cal.Rptr.3d 539, 278 P.3d 803].)

VRL asserts it repeatedly informed EID the project required additional CEQA review based on potentially significant environmental impacts due primarily to cumulative impacts. We disagree. At no time did VRL assert that approving the MOU as a categorically exempt project violated CEQA because of the project's cumulative impacts. The closest VRL came to making that point was arguing, under a section in a letter to EID regarding growth-inducing impacts, that approving the project will redirect water from other uses and thus involve offsite impacts on the environment. This statement did not put EID on notice that a member of the public was challenging its approval of the project as a class 3 categorical exemption because of possible cumulative impacts, as CEQA defines cumulative impacts. (See Guidelines, § 15355.) A level of specificity beyond such generalized comments as VRL's is required to exhaust administrative remedies. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 616 [91 Cal.Rptr.3d 571].)

Because we affirm the judgment against the Tribe's challenges, and because VRL did not exhaust its administrative remedies on the issue of cumulative impacts, we do not address its claim of court error under CEQA.

## II

### *The LAFCO Conditions*

The trial court concluded EID acted in excess of its jurisdiction by determining the LAFCO restrictions imposed as part of the 1989 annexation were unconstitutional and by approving the MOU in violation of those conditions. It further concluded EID could directly challenge the conditions only by means of a reverse validation action, and that such an action was long since time-barred by a 60-day statute of limitations. The court also held that even if the reverse validation statute of limitations did not apply, it still could not rule on the constitutionality of the LAFCO conditions because LAFCO, the agency that imposed the conditions, was not a party to this action.

The Tribe claims the court erred. It asserts the conditions were void *ab initio* because they were unconstitutional, and EID had an affirmative duty to consider and evaluate evidence on that point before reaching a decision on the MOU. The Tribe also claims a reverse validation action is required only when challenging an annexation, not any conditions imposed as part of approving an annexation, and that the validation action statutes did not apply to EID raising the constitutionality of the LAFCO conditions as a defense to VRL's petition for writ of mandate. The Tribe also asserts LAFCO is not an essential party to resolving the constitutionality of its conditions because EID raised them as a defense and VRL chose not to join LAFCO to this action.

VRL claims the Tribe lacks standing to press its argument against the LAFCO conditions here. EID, the government agency found to have violated the LAFCO Act, has not appealed the trial court's determination. VRL argues the Tribe has no standing to challenge EID's apparent acceptance of the trial court's ruling and, in turn, the application of the LAFCO conditions to EID's approving the MOU, particularly when neither EID nor LAFCO are before us.

Even if the Tribe has standing, VRL argues the trial court correctly determined EID exceeded its authority by declaring the conditions unconstitutional and by approving the MOU in violation of the conditions.

In its appeal, VRL also claims the trial court erred when it failed to find that EID was barred by the 60-day statute of limitations for a reverse validation action from challenging the legality of the LAFCO conditions.

Assuming for purposes of argument that the Tribe is an aggrieved party from the trial court's judgment under the LAFCO Act and thus has a right to

appeal, we nonetheless affirm the trial court's decision on its merits. EID exceeded its jurisdiction by approving the MOU in violation of the LAFCO conditions. Because we affirm on this ground, we need not reach the parties' other arguments.

■ The Legislature has vested LAFCO's with the sole and exclusive authority to approve annexations of territory into special districts. (Gov. Code, §§ 56100, 56375, subd. (a)(1).) This authority includes the power to impose conditions of approval on an annexation. (Gov. Code, § 56886.) These conditions are enforceable against any public agency designated in the condition. (Gov. Code, § 56122.)

Approvals of annexations and conditions of annexation by LAFCO's are quasi-legislative determinations. (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 495 [87 Cal.Rptr.2d 702, 981 P.2d 543].) As such, a public agency charged with enforcing or complying with an annexation's conditions of approval has no discretion to disregard them.

This is not to say EID could never challenge the conditions' legality by means provided by law. Rather, it is to say that at the time EID approved the MOU, the LAFCO conditions were binding upon it, and EID had no discretion to disregard them.

■ The Tribe argues EID had authority to consider the validity of the LAFCO conditions and find them void *ab initio* on constitutional grounds. This is incorrect. EID has only those powers vested in it by the Constitution or by statute (*California State Restaurant Assn. v. Whitlow* (1976) 58 Cal.App.3d 340, 346–347 [129 Cal.Rptr. 824]), and none of the powers granted to irrigation districts in general or EID in particular include the authority to determine the validity or constitutionality of, or the discretion not to comply with, annexation conditions imposed by LAFCO (Wat. Code, §§ 22225–22235, 22975–22977). Thus, EID's determination that the conditions were unconstitutional, and its decision not to comply with them, exceeded its authority and are void.

■ Whether the LAFCO conditions are unconstitutional are issues of law reserved under the constitutional doctrine of separation of powers to be resolved by the judiciary. A local official lacks authority to disregard a statute or other legislative determination based on the official's belief that it is unconstitutional. (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1068 [17 Cal.Rptr.3d 225, 95 P.3d 459].) And until such time as a court of law upon a proper timely petition enjoins enforcement of the conditions, they are deemed to be valid. EID had no discretion but to comply with the conditions.

As the trial court stated, EID was not without a remedy. When LAFCO approved the annexation in 1989, it retained jurisdiction to review and revise the conditions. Before approving the MOU, EID could have petitioned LAFCO to amend the annexation conditions to allow for the proposed water connection. Had LAFCO refused, EID then could have challenged that decision in an appropriate action.

The trial court correctly determined a writ of mandate should issue to enforce the LAFCO conditions against the MOU and order EID to comply with them.

## DISPOSITION

The judgment is affirmed except to reverse and remand for the sole purpose of ordering the trial court to mandate EID to conduct further proceedings in accordance with CEQA. Costs on appeal are awarded to VRL. (Cal. Rules of Court, rule 8.278(a).)[4]

Blease, Acting P. J., and Duarte, J., concurred.

---

[4] The Tribe's request for supplemental judicial notice is denied. The records it seeks to be judicially noticed are not part of the administrative record nor the record before the trial court at the time judgment was entered.